IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America,

Plaintiff/Respondent,

vs.

Andres Espinoza-Torres,

Defendant/Movant.

CR 99-734-3-PHX-RGS
CV 04-2651-PHX-RGS (MS)

**REPORT AND RECOMMENDATION**

TO THE HONORABLE ROGER G. STRAND, UNITED STATES DISTRICT JUDGE:

Movant, currently confined at the United States Penitentiary-Victorville, Adelanto, California, filed a "Motion to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody" pursuant to 28 U.S.C. § 2255 ("Motion") on November 22, 2004. [Doc. # 501].[1] In this Motion, Movant contended that:

1. Trial counsel was ineffective by
   a. failing to present a duress defense;
   b. failing to call Movant to testify regarding his duress defense; and,
   c. failing to make a motion to sever his trial from co-defendant Carlos Garcia-Mesa; and,

---

[1] Although Movant's Motion has been assigned a civil number, CV 04-2651-PHX-RGS (MS), all documents related to this motion are filed in the Court's criminal file, CR 99-734-3-PHX-RGS. Therefore, whenever the undersigned refers to a document contained in the file for this case, he refers to the docket number of the document contained in the criminal file.

2. Appellate counsel was ineffective by failing to petition for a writ of certiorari from the United States Supreme Court.

Because the Motion was not signed, the Court ordered Movant to file a certificate that his original signature on the certificate operated as his signature on the Motion. [Doc. # 504]. Movant filed the certificate, and attached a copy of the November 22, 2004 Motion. [Doc. # 511]. The attached Motion was not the same as the November 22, 2004 Motion, however. Instead, Movant added a third claim that:

3. His request to contact the Mexican Consulate was ignored and denied, in violation of international laws and treaties.

The Court considered this third claim in its screening order. [Doc. # 522].

## I. PROCEDURAL BACKGROUND

In the early morning hours of August 14, 1999, a group of six illegal immigrants were smuggled into the United States and housed in a drop house in Phoenix, Arizona. [Doc. # 251 at 24]. "Cacho" smuggled this group into the United States. [Id. at 16]. Cacho arranged for "Guero" and "Arminda" to house the immigrants in a Phoenix drop house until the smuggling fees were paid. [Id. at 14-16]. Some of these immigrants were to be transported to North Carolina by Jose Hernandez-Torres ("Jose") and "Damaso." [Id. at 20]. Three other immigrants, the "Gonzalez Brothers," were smuggled into the United States on August 9, 1999 by an unknown smuggler associated with Guero and Arminda. [Id. at 20]. The Gonzalez Brothers were to be transported to Washington by a cousin named "Pedro." [Id. at 19]. These nine illegal immigrants were all housed at a drop house at 1312 West Sunland, Phoenix, on the morning of August 14, 1999. [Id. at 29].

At about 7:00 a.m. on the morning of August 14, 1999, Jose was sleeping at the Motel 6 in Phoenix, waiting for the immigrants to arrive so he could take them to North Carolina. [Id.]. Luis Soto-Espinoza ("Luis") entered his room and

demanded his money and to know where his "pollos"[2] were. [Id. at 25]. Luis then called for backup, and two other men arrived–a man named "El Negro" and Movant. [Id.]. After being threatened, Jose admitted that he knew where some illegal immigrants were. [Id. at 26]. The three men then kidnaped Jose in his van, and went to the drop house at 1312 West Sunland where the nine illegal immigrants were sleeping. [Id.]. The nine illegal immigrants were forced into the van at gunpoint. [Id. at 27]. They met up with Ricardo Torres-Espinoza ("Ricardo"), who took four of the illegal immigrants in his car. [Id.]. The two groups then met at the Cocanut Grove Motel, where the nine illegal immigrants and Jose were held hostage. [Id. at 28]. The kidnappers demanded ransom money from the illegal immigrants' relatives, including Pedro, who was staying at Guero and Arminda's house. [Id.].

Pedro agreed to meet the kidnappers at a Pep Boys in Phoenix to pay a ransom for the release of the Gonzalez Brothers. [Id. at 32]. The first meeting was unsuccessful because Pedro, Guero, and an unnamed smuggler went to the Pep Boys on Van Buren Street. [Id.]. El Negro and Carlos Garcia-Mesa ("Roman") went to the Pep Boys on McDowell Road with the Gonzalez Brothers to collect the ransom. [Id.]. El Negro and Roman returned to the Cocanut Grove Motel, and Luis, Movant and Ricardo decided to handle the next meeting with Pedro for the transfer of the Gonzalez Brothers. [Id. at 33]. The smugglers who had initially brought the illegal aliens into the country followed Pedro to the Pep Boys in a burgundy-colored van. [Id.]. The remainder of the illegal aliens remained at the Cocanut Grove Motel with El Negro, Alejandro Torres-Espinoza ("Alejandro"), Alberto Torres-Mendoza ("Alberto"), and Roman. Movant and Alberto are brothers, and Luis was their nephew. [Id. at 6]. The meeting took place at around 4:00 p.m. [Id. at 33].

[2] "Pollos" is the street term for illegal aliens who pay money to be smuggled into the United States. [Id. at 10].

Movant and Ricardo exited the car while Luis and Pedro discussed payment for the Gonzales Brothers, who were seated in the back seat of the car. [Id. at 34]. Cacho, who was armed, then confronted Movant, who was also armed. [Id. at 35]. The Astro van pulled up with men armed with high-powered assault rifles, and gunfire erupted. [Id.]. Movant then shot Cacho,[3] took his gun, and chased after Pedro, who was driving away. [Id. at 35-36]. Luis, and one of the Gonzales Brothers, were both shot dead during the gunfire. [Id. at 36]. Movant and Ricardo fled to a nearby restaurant, where police later arrested them as they sat eating. [Id. at 38-39]. Witnesses identified Movant as the person doing most of the shooting. [Id. at 38]. The remaining hostages at the Cocanut Grove Motel remained hostages, until El Negro and Roman decided to leave the motel. [Id. at 44]. Roman was arrested almost one year later, and El Negro was never arrested. [Id. at 45]. The remaining two Gonzales Brothers told the police about the hostages at the Cocanut Grove Motel, and Alejandro and Alberto were arrested there. [Id.].

Although Movant was advised of his Miranda[4] and consular notification rights, Movant waived his Miranda rights and made statements to Officer Frank Chavez. [Doc. # 276 at 10-20 (trial transcript, Chavez testimony)]. Movant placed himself at the scene of the Pep Boys shootout while armed, and admitted to shooting Cacho. [Id. at 58]. Other co-defendants also made post-arrest statements to the police.

On August 25, 1999, Movant was indicted on four counts, including conspiracy and aiding and abetting the transportation and harboring of illegal aliens (8 U.S.C. § 1324(a)(1)(A)(ii), (iii) and (v)(I)-(II)) and illegal weapons possession (18 U.S.C. § 922(g)(5)). [Doc. # 1]. A superceding indictment was filed shortly thereafter charging Movant with 36 counts, including hostage taking (18 U.S.C. § 1203), transportation and harboring illegal aliens, interstate extortion (18 U.S.C. § 875(a)), and conspiracy

---

[3] Cacho later died from the gunshot wounds.

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

to commit these crimes. [Doc. # 36]. Movant was also indicted for illegal weapons possession and possession or use of a firearm in a crime of violence (18 U.S.C. § 924(c)). [Id.]. The superceding indictment also contains the allegation that this detention resulted in the death of one of the Gonzales Brothers or others. Second and third superceding indictments were subsequently returned charging Movant with 49 counts similar to those contained in the superceding indictment. [Doc. # 89, 128].

A thirty-three day trial ensued, and the jury found Movant, and the co-defendants, guilty on all counts. [Doc. # 303]. Movant filed a motion for a new trial.[5] [Doc. # 314]. The trial judge denied the motion. [Doc. # 330]. On June 15, 2001, Movant was sentenced to life plus 235 years imprisonment, and terms of supervised release. [Doc. # 353]. Movant filed a Notice of Appeal, and appellate counsel was appointed. [Doc. # 378, 378]. Movant's appeal was consolidated with his co-defendants' appeals. [Ninth Circuit Court of Appeals Docket Sheet, Order Dated Nov. 8, 2001].

In his appeal, Movant contended that his Confrontation Clause rights were violated by the trial judge's refusal to grant a severance after certain post-arrest statements by a non-testifying co-defendant (Roman) to an officer were read into evidence. [Ninth Circuit Court of Appeals Docket Sheet, Brief Dated Sep. 12, 2002, at 54-65]. Movant further argued that admission of prior arrests while in the possession of firearms was in error, as well as the admission of a non-testifying co-defendant's statements to an undercover informant. Movant also contended that the trial judge erred in allowing evidence of drug use to demonstrate the fear the

---

[5] In his motion, Movant contended that the prosecutor's remarks to the jury regarding Movant's alleged shooting of a 15-year-old hostage impermissibly sought to appeal to the passions of the jury, and that it was not necessary to establish which of the defendants killed the victim for the Government to carry its burden of proof. Movant further alleged that the Court allowed the introduction of prior bad acts, including an alleged prior robbery Movant committed, evidence that Movant had been in the company of co-defendants on a prior occasion when firearms were found, and that Movant had been in possession of two pistols prior to the crimes.

hostages had of Movant's violent behavior. Lastly, Movant argued that when taken in the aggregate, these errors amounted to an unfair trial. On November 24, 2003, the Ninth Circuit Court of Appeals affirmed Movant's conviction. [Doc. # 491]. Movant's instant Motion followed.

In its response to the Motion, the Government first notes that as to severance, counsel for Movant did indeed pursue a severance motion prior to trial. [Doc. # 532]. The Government states that the motion was denied, re-raised at trial, and denied again. The Government further notes that the issue was raised on appeal with the Ninth Circuit Court of Appeals, and therefore Movant is precluded from raising the issue of severance on collateral review.

As a general matter, the Government avers that Movant fails to provide any support for his claims that he acted under duress, that he wished to testify at trial, or that he wished to pursue claims before the U.S. Supreme Court over appellate counsel's objection. Movant's pleading deficiencies aside, the Government notes that at no time did Movant express to law enforcement that he participated in the conspiracy under duress, or to the trial judge that he wished to testify.

Lastly, as to Movant's claim that he was not allowed access to the Mexican Consulate before police questioning continued, the Government first contends that Movant has procedurally defaulted the claim by failing to raise it on direct appeal. In the alternative, the Government argues that Movant was not prejudiced by the officer continuing to ask Movant questions after he requested consular notification because the record indicates that during his interview with police, which was recorded and transcribed, Movant was advised orally and in writing of his right to consular notification under the Vienna Convention on Consular Relations. The Government notes that Movant signed a notification form requesting the Consulate be notified, but still agreed to answer questions.

Movant filed a Reply. [Doc. # 552]. Movant first claims that he never revealed to anyone that he was acting under duress when committing the crimes because he

was afraid that both he, and his family members in Mexico, would be killed if he told authorities that he was only participating under duress. Movant notes that other people involved in the operation were not apprehended. [Id. at 2-4].

As to his claim that he was not allowed to testify on his own behalf, Movant states that he was lead to believe by his counsel that it was the counsel's decision as to whether he would testify, not his own. [Id. at 4-5]. Movant clarifies his severance claim, stating that even after the first severance motion was denied, counsel should have *again* filed a severance motion when the co-defendant's statements were admitted as evidence. [Id. at 5]. Movant further states that had the Mexican Consulate been summoned prior to further questioning, Movant would not have given the statements he did because translations would have been in a dialect Movant "could better understand." [Id. at 5-7]. Although not contained as a claim in the Motion,[6] Movant contends that counsel was ineffective for not seeking suppression of statements made after Movant requested consular notification. [Id. at 7].

## II. ANALYSIS

### A. Movant's Ineffective Assistance of Counsel Claims

To prevail on his claims of ineffective assistance of counsel, Movant must establish that: (1) considering all of the circumstances, his counsel's representation fell below an objective standard of reasonableness; and (2) that Movant was prejudiced by such representation. Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984); Hill v. Lockhart, 474 U.S. 52, 57-59 (1985); United States v. Solomon, 795 F.3d 747, 749 (9th Cir. 1986). A movant establishes prejudice when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[6] The consular notification claim is not made in the Motion as an ineffective assistance of counsel claim.

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

To satisfy the first prong of the Strickland test, Movant must identify the specific acts or omissions of counsel that he alleges do not meet the reasonable professional judgment standard. Id. at 688-90. The Court must then determine whether the acts or omissions alleged fall outside a wide range of professionally competent decisions given the surrounding circumstances. Id. Movant must overcome the strong presumption that his counsel's conduct fell within this widerange of reasonable assistance, and that counsel made all significant decisions exercising reasonable professional judgment. Id. at 689-90; United States v. Hamilton, 792 F.3d 837, 839 (9th Cir. 1986), disapproved on other grounds, United States v. Kim, 105 F.3d 1579 (9th Cir. 1997). The Court determines the reasonableness of counsel's actions from the facts of each particular case, and from counsel's perspective at the time of the alleged error based on all the attendant circumstances. Strickland, 466 U.S. at 689.

### 1. Movant's Claim That Trial Counsel Was Ineffective

#### a. Movant's Claim that Trial Counsel Should Have Pursued Another Severance Motion

Movant claims that trial counsel should have pursued another severance motion when Roman's (co-defendant Carlos Garcia-Mesa) statements to police were admitted as evidence. When Roman was arrested nearly one-year after the shootings, he made written and recorded audio statements to the police regarding the hostage-taking and shootings. [Doc. # 154, Exh. 1]. Roman's statements to police named Movant as a participant.[7] Roman did not testify at trial, so his co-defendants could not cross-examine Roman as to his statements to police.

---

[7] Movant was also known as "Yaqui," which is the name mentioned in the written statement.

The record demonstrates that counsel sought pre-trial severance of Movant's trial pursuant to Bruton v. United States, 391 U.S. 123 (1968) when the Government indicated that it would seek to admit the statements as evidence against Roman. [Doc. # 144; Doc. # 431, p. 28-30 (Sept. 12, 2000 Hearing Transcript in which Movant's counsel joins the severance motion); Doc. # 434, p. 56 (Dec. 5, 2000 Hearing Transcript in which Movant's counsel joins the severance motion)]. The pretrial motions for severance were denied, but the trial judge did order that Roman's statement be redacted so as to avoid Confrontation Clause issues. [Doc. # 160 at 2; Doc. # 200]. That is, the statements were admitted as evidence against Roman as non-hearsay admissions, to the extent that the statements did not mention Movant specifically.

Movant does not provide any explanation as to when his trial counsel should have raised another severance motion. Further, Movant makes no argument as to how counsel's failure to seek severance was prejudicial. The Court has reviewed Agent Rascon's testimony regarding Roman's statements to police. The Government did not stray from its agreement with defense counsel regarding introduction of the statements as evidence. When Agent Rascon made reference to the co-defendants in the courtroom when elaborating on one of Roman's statements, counsel made a motion to sever, and the motion was denied. [Doc. # 448 at 128-167 (transcript of testimony of Agent Rascon-Rubio, the agent who interviewed Roman); # 449 at 10-64 (same); Doc. # 449 at 89-91 (counsel's severance motion)].

Substantial evidence and testimony that Movant was involved in the alleged crimes, other than Roman's statements, was presented to the jury. For example, many of the aliens held hostage testified at trial regarding Movant's participation in the conspiracy. Movant's own statements to police were admitted as evidence of his participation in the conspiracy. The father of Luis, the co-conspirator that was killed during the shootout, testified about Movant's activities with Luis. A police officer

testified that Movant was arrested prior to instant offenses for weapons possession, while in the company of El Negro. Lastly, Movant authored two letters while incarcerated prior to trial that contained incriminating information. [Doc. # 431 at 46 (Movant's counsel's recognition that two letters were written by Movant while in jail, and that the Government would seek to introduce these letters); Doc. # 448 at 115-118 (translation of September 17, 1999 letter); Doc. # 446 at 66-68 (fingerprint expert's testimony that Movant's fingerprints were on two letters (admitted as exhibits 62-A and 180)); Doc. # 446 at 73-77 (handwriting expert's testimony that the handwriting contained in the letters was Movant's handwriting)].

Movant contends in his Reply that the U.S. Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004), supports his conclusion that counsel was ineffective for not pursuing severance. Crawford had not been decided at the time of Movant's trial, and therefore could not have been the basis of a severance motion. Further, even if the principles put forth in Crawford regarding hearsay statements and confrontation should have been pursued at trial, the statements were not introduced as evidence against Movant. Instead, the statements were redacted only to be admissible against Roman. In addition, under Crawford, the Court would determine whether, even if an error of constitutional magnitude occurred, the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 629 (1993). As the Court has stated, ample evidence existed aside from the co-conspirator's statements to support the jury's guilty verdicts.

The Court finds, therefore, that trial counsel was not unreasonable for failing to raise another severance motion, and that any alleged failure to do so did not result in prejudice to Movant. Accordingly, the Court will recommend that this claim be denied.

**b. Movant's Claim that Trial Counsel Should Have Presented a Duress Defense and Allowed Movant to Testify as to the Defense**

Trial counsel opted not to present any defense after the prosecution rested its case. Movant contends that trial counsel should have presented evidence, including his own testimony, that he was acting under duress from Luis (the co-conspirator that was killed in the shootout at Pep Boys).

What Movant fails to consider, however, is that had trial counsel followed Movant's purported direction to present a duress defense (had such direction been given)[8], including allowing Movant to testify, defense counsel would have opened the door to the prosecution to delve into every aspect of Movant's activities in relation to the crimes. By testifying that he acted under duress, Movant would have admitted, in his own words, to his participation in the crimes. "A tactical decision. . . with which the Defendant disagrees cannot form the basis of a claim of ineffective assistance of counsel." Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir. 1984). The decision not to have Movant testify was reasonable in light of the fact that Movant's testimony would have operated as an admission that he indeed participated in the crimes, albeit under duress. In light of the evidence that Movant was related to Luis, had participated in previous criminal activities with Luis, and carried his own weapon, counsel would have been reasonable to conclude that a duress defense was not viable.

Accordingly, the Court will recommend that Movant's ineffective assistance of counsel claim related to failure to present a duress defense and to call Movant as a witness to this duress be denied. Because the motion and record conclusively show that Movant is not entitled to relief on this claim, 228 U.S.C. § 2255, the Court will recommend that his request for an evidentiary hearing, contained in his Reply, be denied.

**2. Movant's Claim that Appellate Counsel Was Ineffective**

---

[8] There is no indication in the trial record that Movant ever requested counsel to pursue a duress defense.

Movant claims in his Motion that appellate counsel was ineffective for failing to file a petition for writ of certiorari with the United States Supreme Court.[9] The Court will recommend that Movant's claim be denied, as Movant provides no basis in his Motion for his argument that the U.S. Supreme Court would have been likely to grant certiorari on the issues presented in Movant's appeal.

**3. Movant's Claim that International Laws and Treaties Were Violated by the Arresting Officers' Failure to Notify the Mexican Consulate of Movant's Detention**

Trial counsel[10] raised this issue prior to trial. [Doc. # 56 (motion); Doc. # 80 at 75-87 (Movant's counsel's cross examination of the officer in regard to Movant's statements to police and suppression)]. The trial judge ordered the parties to brief the question as to what exactly arresting officers must do under international law once a foreign national requests that his or her consulate be notified of his arrest and detention. [Id. at 101-106]. The issues were then briefed. [Doc. # 81, 84, 86]. Once the defendants in the case agreed to enter guilty pleas and a change of plea hearing was set (Doc. # 118), Defendants' motions related to consular notification were withdrawn. [Doc. # 97; 102]. At the change of plea hearing, however, the defendants stated to the Court that no pleas of guilty would be entered. [Doc. # 121].

The trial judge later denied the motion made prior to the defendants agreeing to plead guilty. [Doc. # 165]. The trial judge held that the totality of the

---

[9] The Court will disregard Movant's attempts to add claims in his Reply related to appellate counsel's representation (e.g., "failing to communicate" and "failing to raise independent grounds on appeal"). A Reply brief is not the proper mechanism to assert claims. Further, the claims contained in the Reply are merely conclusory in nature, as they offer no details as to how appellate counsel failed to communicate or failed to raise certain grounds.

[10] It was agreed to during pretrial proceedings, on the record and before the trial judge, that all counsel joined in each others' motions unless stated on the record otherwise. Therefore, motions contained in the record may only reflect one defendant as the actual movant.

circumstances surrounding defendant Ricardo Torres-Espinoza's interrogation warranted the conclusion that the statements made were uncoerced and made with the "requisite level of apprehension."

Even assuming that the Vienna Convention on Consular Relations compels U.S. Courts to conclude that all police questioning must cease when consular notification is requested, and assuming that such a claim is cognizable on habeas corpus review, Movant fails to show that he was harmed by any lack of notification. Medellin v. Dretke, 125 S.Ct. 2088, 2091 (2005). Movant entirely fails to address that even though he was also "Mirandized," he still opted to make statements to police. Movant's claim that he did not understand the interrogating officer's dialect is not credible. The officer testified at trial that his native language is Spanish, and that he understood what Movant was saying in Spanish. Movant does not explain what dialect the officer spoke, what dialect Movant speaks, and how these dialects are so different that Movant could not understand basic instructions that he had a right to remain silent and to an attorney. Further, as the Court previously indicated, ample other evidence existed that Movant was part of the conspiracy.

To the extent Movant claims in his Reply that trial counsel was ineffective for failing to pursue a motion to suppress, and to the extent such a claim is cognizable when raised for the first time in a reply brief, Movant's claim fails. First, counsel did pursue a suppression motion, and that motion was denied. Second, Movant cannot demonstrate that counsel's failure to pursue suppression was prejudicial, for the reasons stated above.

Accordingly, the Court will recommend that Movant's claim related to consular notification be denied.

## III. RECOMMENDATION

Based on the foregoing analysis,

IT IS RECOMMENDED that Movant's "Motion to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody" pursuant to 28 U.S.C. § 2255 [Doc. #

501], including Movant's request for an evidentiary hearing in his Reply regarding the duress claim, be DENIED and DISMISSED in its entirety.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment. The parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. 28 U.S.C. §636(b)(1) and Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure. Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to *de novo* consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this 16th day of November, 2005.

Morton Sitver
United States Magistrate Judge